**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TARYN CHRISTIAN,
            *Petitioner-Appellee,*

v.

CLAYTON FRANK, Director, State of
Hawaii Department of Public
Safety,
            *Respondent-Appellant,*

and

STATE OF HAWAII DEPARTMENT OF
PUBLIC SAFETY,
            *Respondent.*

No. 08-17236

D.C. No.
1:04-cv-00743-
DAE-LEK

OPINION

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

Argued and Submitted
October 15, 2009—Honolulu, Hawaii

Filed February 19, 2010

Before: Robert R. Beezer, Susan P. Graber and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Beezer

**COUNSEL**

Mark Barrett, Esq., Norman, Oklahoma, for petitioner-appellee-cross-appellant.

Richard K. Minatoya, Deputy Prosecuting Attorney, Wailuku, Hawaii, for respondent-appellant-cross-appellee.

---

## OPINION

BEEZER, Circuit Judge:

We must decide whether the district court erred in granting habeas relief on behalf of petitioner Taryn Christian.[1] The district court granted Christian's petition for a writ of habeas corpus, holding that the Hawaii Supreme Court unreasonably applied *Chambers v. Mississippi*, 410 U.S. 284 (1973). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We hold that the Hawaii Supreme Court's application of *Chambers* was reasonable, and we reverse the district court's grant of the petition.

## I

The events that led to the instant appeal stem from Christian's alleged involvement in a murder on July 14, 1995. Early that morning, Vilmar Cabaccang and his girlfriend, Serena Seidel, awoke from their slumber due to a noise outside the residence. Seidel looked out the window and saw someone inside Cabaccang's car. Cabaccang and Seidel immediately bolted outside to confront the unidentified intruder. The intruder fled on foot, and both Cabaccang and Seidel gave chase. Seidel stopped briefly to attempt to enlist a friend's help by banging on the door of the friend's residence. When no one answered the door, Seidel resumed her pursuit of the intruder.

---

[1]In a concurrently filed memorandum disposition, we decline to issue a certificate of appealability for Christian's cross-appeal claims. *See Christian v. Frank*, No. 08-17438, 2010 WL _____ (9th Cir. Feb. 19, 2010).

Seidel eventually caught up to Cabaccang and the intruder and found the two men engaged in a struggle. Cabaccang warned Seidel that the unknown man had a knife. Undeterred, Seidel attempted to assist Cabaccang, and their eventual combined efforts caused the man to drop the knife and flee. Seidel then observed that there was blood all over the immediate area and that Cabaccang had been stabbed. Shortly thereafter, Phillip Schmidt, a local resident who heard the noise from the struggle, rushed to the scene. Upon seeing Cabaccang's injuries, he called 911. Cabaccang ultimately died from the knife wounds.

The police initially suspected that Hina Burkhart was responsible for Cabaccang's death based on a statement by a friend of Seidel's. The police discarded this theory after two people placed Burkhart in another location at the time of the crime and neither Seidel nor Schmidt identified Burkhart as the perpetrator during police photo lineups.

Three days after the attack, Christian told his former girlfriend that he had killed Cabaccang. His former girlfriend conveyed this information to the police a few days later. Christian was arrested and charged with the murder after the police uncovered further incriminating evidence against him, including photos of Christian wearing a baseball cap identical to that found at the crime scene and identifications by both Seidel and Schmidt during police photo lineups.

At trial, Christian's theory of defense was that he had been misidentified as the perpetrator. In support of this defense, Christian sought to introduce testimony that Burkhart had confessed to the murder on two separate occasions. Burkhart exercised his Fifth Amendment privilege against self-incrimination, and so the court declared him "unavailable," as defined by Rule 804(a) of the Hawaii Rules of Evidence. Unable to question Burkhart directly regarding his alleged confessions, Christian attempted to call the two witnesses

who allegedly heard Burkhart confess to the murder.[2] The trial court conducted a hearing pursuant to Rule 103 of the Hawaii Rules of Evidence to determine whether there was sufficient corroboration of Burkhart's alleged confessions to admit them into evidence.[3]

The first witness to one of Burkhart's alleged confessions was William Auld. Christian's counsel explained during the Rule 103 hearing that Auld intended to testify that, while sharing a prison cell with Burkhart in late 1995, Burkhart told Auld that he had killed Cabaccang. Auld was prepared to testify that he had believed that Burkhart was telling the truth when he made that statement.

The second witness was Patricia Mullins. According to Christian's counsel, Mullins would testify that, on a previous occasion, "considerably before" the murder in July 1995, she had seen Burkhart pull out a knife during an argument. She was also prepared to testify that several days after the murder, she confronted Burkhart about whether he had killed Cabaccang. Burkhart allegedly responded by stating that he had killed Cabaccang and that he thought he would get away with the murder. Mullins acknowledged, however, that she routinely used drugs with Burkhart and that she did not know if he had been under the influence of drugs at the time of his confession to her. Mullins would also testify that, at a later date, Burkhart allegedly warned her to not talk about his prior confession to the Cabaccang murder.

---

[2]Although some details in the record allude to a third witness, the state trial court, the Hawaii Supreme Court, the federal district court and Christian's appellate briefing all focus entirely upon the same two witnesses. We do the same.

[3]Under Hawaii Rule of Evidence 804(b)(3), a "statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

In an effort to fulfill Rule 804(b)(3)'s trustworthiness requirement, at the Rule 103 hearing, Christian proffered several corroborating details that he intended to offer as evidence. First, Christian alleged that Auld's and Mullins' statements corroborated each other. Second, Christian explained that he would call a witness to testify that Burkhart owned a knife that "could have been" similar to the one used in the murder. Third, Cabaccang's neighbor, Tesha Santana, would testify that she was expecting Burkhart to visit her that night and that he never showed up. Fourth, Christian intended to show that Cabaccang's keys were found at the scene of the murder and that Cabaccang's car showed no signs of forced entry.[4] And fifth, Christian planned to demonstrate that Seidel acted strangely on the night of the murder and called out to Santana specifically instead of calling for help generally.[5]

The trial court ultimately concluded that this evidence, in the aggregate, was insufficient to corroborate Burkhart's alleged confessions and thus refused to admit Auld's and Mullins' testimony. Christian was convicted by a jury of second-degree murder, attempted third-degree theft and use of a deadly or dangerous weapon in the commission of a crime.

Following his conviction, Christian moved for a new trial. The trial court orally denied Christian's motion. Christian then timely appealed to the Hawaii Supreme Court, arguing that the district court erred by, among other things, excluding the testimony about Burkhart's alleged confessions. The Hawaii Supreme Court affirmed the trial court's denial of

---

[4]Christian reasoned that the car was unlocked and that the presence of Cabaccang's keys suggested that the murderer was someone who had some relation to Cabaccang and thereby had access to his keys. Burkhart allegedly had such a relation to Cabaccang via his acquaintance with Santana. Of course, Cabaccang's car may have been unlocked and Cabaccang may have simply had the keys on his person that night and dropped them during the struggle.

[5]Christian's theory was that Seidel wanted to talk with someone who knew Burkhart, such as Santana.

Christian's post-verdict motion for a new trial and also affirmed Christian's convictions for second-degree murder and attempted third-degree theft.[6] *State v. Christian*, 967 P.2d 239, 243 (Haw. 1998). The Hawaii Supreme Court reasoned that the convictions were appropriate because Christian's case was distinguishable from *Chambers*, and Christian had not suffered any violation of his due process rights. *Christian*, 967 P.2d at 260-63.

Christian then timely petitioned for a writ of habeas corpus in the United States District Court for the District of Hawaii. A federal magistrate judge issued 82 pages of findings and recommendations, ultimately recommending that the writ be issued. The federal district court adopted in part and modified in part the magistrate judge's findings and recommendations and, in a 35-page order, granted Christian's petition for a writ of habeas corpus. The district court rested its decision on its conclusion that the Hawaii Supreme Court decision affirming the exclusion of the testimony about Burkhart's confessions was an "unreasonable application" of *Chambers*.

The appeal to this court timely followed.

## II

We review *de novo* a district court's decision to issue a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Lewis v. Mayle*, 391 F.3d 989, 995 (9th Cir. 2004). The district court's findings of fact are reviewed for "clear error." *Mejia v. Garcia*, 534 F.3d 1036, 1042 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 941 (2009).

**[1]** Federal courts review habeas corpus petitions from

---

[6]The Hawaii Supreme Court reversed Christian's conviction for use of a deadly or dangerous weapon in the commission of a crime because it was "included" in the second degree murder conviction. *See Christian*, 967 P.2d at 263-65.

state prisoners under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006). Under AEDPA, a federal court may not grant a habeas corpus petition unless the "last reasoned" state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

A state court decision is an "unreasonable application of" clearly established federal law if the state court identified the correct governing legal rule but unreasonably applied it to the facts at hand. *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "Clearly established Federal law" refers to the holdings of the Supreme Court at the time of the relevant state-court decision. *Id*. at 412.

**[2]** The AEDPA standard is " 'highly deferential' " and "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). A federal court may second-guess a state court decision only if it determines that "the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).

## III

In this appeal, we are compelled to revisit *Chambers* and decide whether the Hawaii Supreme Court unreasonably applied *Chambers* by affirming the exclusion of testimony about the Burkhart confessions in Christian's trial.[7] The

---

[7]We reject the argument that *Chambers* is not clearly established federal law for the purpose of a § 2254 habeas petition. Although there are factual

Hawaii Supreme Court explained at great length its conclusion that the exclusion of the testimony about Burkhart's confessions did not violate Christian's due process rights and why it believed that *Chambers* was "manifestly distinguishable" from Christian's case. *Christian*, 967 P.2d at 260. In light of the highly deferential standard afforded state court decisions under AEDPA and the particular facts of Christian's case, we hold that the Hawaii Supreme Court's application of *Chambers* was reasonable.

## A

In *Chambers*, the Supreme Court of the United States concluded that Leon Chambers had been deprived of his due process right to a fair trial. *Chambers*, 410 U.S. at 302. Chambers was convicted of murder by a jury in Mississippi state court. *Id.* at 285. The murder itself happened in a small town in southern Mississippi near a bar that two policemen, including the victim, had entered to arrest a young man. *Id.* A crowd of some two dozen men physically impeded the officers' arrest. *Id.* The officers radioed for assistance, additional officers showed up and the officers again tried to make the arrest. *Id.* at 286. A struggle ensued and, during the commotion, the victim policeman was shot in the back repeatedly by someone in the crowd. *Id.* Before he collapsed, the officer turned around and fired two shots into the crowd, one of which was deliberately "aimed" and hit Chambers in the back of the head. *Id.* Chambers was rushed to the hospital by his friends and ultimately survived the shot. *Id.* at 287. The police officer died. *Id.*

On the night of the shooting, Gable McDonald was in the vicinity of the crime. *Id.* McDonald was one of three people

---

differences between *Chambers* and the instant appeal, "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.' " *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment).

who drove Chambers to the hospital that night. *Id.* Shortly after the shooting, McDonald left his wife and moved to Louisiana. *Id.* Sometime later, he returned to the city where the shooting had transpired at the request of Reverend Stokes, an acquaintance of his. *Id.* After meeting with Stokes, McDonald agreed to, and did in fact, make a confession to Chambers' attorneys that he, McDonald, had shot the police officer. *Id.* The confession was transcribed, signed and witnessed, and McDonald affirmed to those present that it had been made voluntarily. *Id.* at 287-88. Local police authorities immediately arrested McDonald. *Id.* at 288.

At a preliminary hearing, McDonald repudiated his prior confession, claiming that Stokes had induced him to make the confession.[8] *Id.* While acknowledging that he had once owned the type of firearm used in the shooting and was in the general vicinity of where the shooting took place, McDonald insisted that he was not the shooter. *Id.* The local justice of the peace accepted McDonald's repudiation, he was released from custody and local authorities undertook no further investigation about his potential involvement in the crime. *Id.*

Chambers was eventually charged and tried for the murder of the policeman. Chambers presented two lines of defense at his trial. First, he argued that he was simply not the shooter. In this regard, conflicting testimony about the night of the shooting was introduced into evidence. One officer testified that he had seen Chambers shoot the victim, whereas another witness testified that he was certain that Chambers did not fire any shots. *Id.* at 289. Three officers testified that they saw the victim shoot Chambers and that they assumed that, in doing so, the victim was shooting his attacker. *Id.* No officer had

---

[8]Stokes allegedly convinced McDonald that, if he confessed to the crime, he could share in the proceeds of a lawsuit that Chambers would bring against the local town. *Chambers*, 410 U.S. at 288. Stokes allegedly assured McDonald that he would not be convicted of the murder despite confessing to the crime. *Id.*

examined Chambers after he was shot to determine whether he had a firearm on his person, and there was no proof that Chambers had ever owned a firearm of the kind used in the shooting. *Id*.

Chambers' additional defense was that McDonald had shot the officer. *Id*. In furtherance of this defense, one witness, a "lifelong friend" of McDonald, testified that he saw McDonald shoot the officer. *Id*. Another witness claimed that he saw McDonald with a firearm in his hand after the shooting took place. *Id*. Chambers called McDonald himself as a witness and introduced McDonald's signed confession into evidence. *Id*. at 289, 291. McDonald disavowed the confession and made reference to his prior repudiation. *Id*. at 291. Chambers attempted to challenge McDonald's earlier repudiation, but state procedural rules prevented him from examining McDonald further. *Id*. Chambers was thereby denied any opportunity to disprove McDonald's repudiation.

Chambers then sought to bolster this theory of defense by introducing testimony that McDonald had allegedly confessed to the crime on three other separate occasions. *Id*. at 292. The first alleged confession was to a friend of McDonald's, who claimed that McDonald had independently confessed to him on the evening of the shooting. *Id*. The second witness was another friend of McDonald's who was prepared to testify that McDonald admitted to shooting the officer as they were driving Chambers to the hospital. *Id*. This same witness was prepared to testify that a week later, McDonald referenced his prior confession and warned the witness to not "mess him up." *Id*. The third witness was McDonald's former neighbor and friend of 25 years. *Id*. He stated that he was prepared to testify that, on the day after the shooting, McDonald admitted to him privately that he was the one who shot the officer and that he had disposed of the murder weapon. *Id*. This witness was also willing to state that several weeks after the shooting, he went with McDonald to purchase a firearm to replace the discarded one. *Id*. Through a combination of several state evi-

dentiary rules, the testimony of all three witnesses was excluded. *Id*. at 292-94.

Chambers was ultimately convicted of murder and sentenced to life imprisonment. *Id*. at 285. The Mississippi Supreme Court affirmed the conviction, holding that the exclusion of the witnesses' testimony was appropriate pursuant to the Mississippi hearsay rules. *Id*. at 285, 293.

**[3]** The Supreme Court of the United States granted certiorari and ultimately concluded that these evidentiary exclusions were, in the aggregate, a violation of Chambers' due process right to a fair trial. *Id*. at 302. In reaching this conclusion, the Court stressed two primary considerations: the amount and quality of the evidence corroborating the testimony about the confessions and the significance of the testimony to the defense. The Court spent the greatest portion of its analysis on the fact that the corroborating evidence "provided considerable assurance of [the testimonies'] reliability." *Id*. at 300. According to the Court, this reliability stemmed from four main sources: each confession was spontaneously made to a different close friend shortly after the crime, each confession was corroborated by other evidence in the case,[9] the confessions were against penal interest and McDonald himself was available in the courtroom to be cross-examined by the state if there was any question about the reliability of the out-of-court statements.[10] *Id*. at 300-01. The Court also briefly noted that the testimony about the confessions was

---

[9]In particular, the Court noted that persuasive corroboration stemmed from "McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, . . . proof of [McDonald's] prior ownership of [the type of firearm used in the shooting] and subsequent purchase of a new weapon" and the "sheer number of independent confessions." *Chambers*, 410 U.S. at 300.

[10]The Court stressed that McDonald's availability "significantly distinguishe[d]" the case from earlier Mississippi cases where the alleged confessor had been declared unavailable. *Chambers*, 410 U.S. at 301.

critical to Chambers' defense and that its crucial nature weighed in favor of admitting it. *Id*. at 302. The Court concluded that, "under the facts and circumstances of this case," Chambers had been deprived of a fair trial. *Id*. at 303.

**B**

**[4]** In its decision affirming the trial court's conviction of Christian, the Hawaii Supreme Court acknowledged that although *Chambers* bore upon Christian's case, the two cases were ultimately distinguishable. *Christian*, 967 P.2d at 260. The Hawaii Supreme Court noted that, unlike in *Chambers*, no eyewitness linked Burkhart with the scene of the crime. *Id*. at 262. On the contrary, the Hawaii Supreme Court noted that the only two eyewitnesses present at the murder, Seidel and Schmidt, had both failed to identify Burkhart in photo lineups and instead had individually identified Christian as the culprit.[11] *Id*. And two witnesses had actually placed Burkhart at a completely different location at the time of the stabbing.

**[5]** The Hawaii Supreme Court also observed that Burkhart made only two unsworn confessions compared to McDonald's four confessions, one of which was sworn in the presence of Chambers' attorneys. *Id*. And the court further

[11]During the evidentiary hearing before the district court, Schmidt recanted his identification of Christian and instead claimed that Burkhart was the person he saw leaving the crime scene. Schmidt's recantation does not change our conclusion that the Hawaii Supreme Court's decision was reasonable. Schmidt's "later recantation of his trial testimony does not render his earlier testimony false," *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005). His recantation is especially unreliable given that it was made more than a decade after his original failure to identify Burkhart as the perpetrator and positive identification of Christian as the perpetrator. *See Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) (en banc) (Kozinski, J., dissenting) ("Appellate courts . . . look upon recantations with extreme suspicion."); *State v. Naeole*, 617 P.2d 820, 824 (Haw. 1980) ("[R]ecantation is to be viewed with the utmost suspicion . . . ."); 58 Am. Jur. 2d New Trial § 345 (2009) ("[R]ecantation testimony is generally considered exceedingly unreliable . . . .").

distinguished the two cases by noting the dearth of other corroborating evidence linking Burkhart to the crime. *Id.* at 262-63. In the aggregate, these facts made the testimony about the alleged confessions in Christian's case much less reliable than the testimony at issue in *Chambers*. *Id.* at 263. Given the great weight that the Supreme Court had placed upon reliability in *Chambers*, the Hawaii Supreme Court concluded that it was proper to distinguish Christian's case. *Id.*

### C

The federal district court held that not only was it wrong to distinguish *Chambers* in such a fashion, but that it was unreasonably wrong of the Hawaii Supreme Court to do so. The district court reasoned that the Hawaii Supreme Court had failed to fully appreciate the inherent reliability of self-inculpatory statements. The district court further concluded that it was inappropriate for the Hawaii Supreme Court to consider the other evidence against Christian when it was examining the reliability of the confession testimony. And finally, the district court stressed that nothing in *Chambers* explicitly "dictated that the same level of corroborating evidence is required." The district court concluded that these considerations made the Hawaii Supreme Court's decision unreasonable and habeas relief was therefore warranted.

### D

**[6]** Although we sympathize with Christian's desire to present evidence that Burkhart allegedly confessed to the murder, we cannot agree with the district court's conclusion that the Hawaii Supreme Court's application of *Chambers* was unreasonable. We are guided and bound by AEDPA's highly deferential standard of review of state court decisions. There are such significant factual differences between the case before us and *Chambers* that the Hawaii Supreme Court's decision to distinguish the two cases was not unreasonable.

**[7]** The Hawaii Supreme Court accurately detailed several ways in which the excluded testimony at issue in this case was materially less trustworthy than the excluded testimony in *Chambers*. There were fewer alleged confessions, the confessions were made to less reputable individuals[12] and the confessions were contradicted, rather than supported, by the other evidence in the case. All of these considerations seriously diminish the reliability of the testimony at issue. This distinguishing analysis was especially appropriate given the fact that the Supreme Court of the United States so heavily stressed that it was the "trustworthiness" of the evidence at issue in *Chambers* that compelled its admissibility. *Chambers*, 410 U.S. at 302.

**[8]** Moreover, *Chambers* can be further distinguished from the case before us in that, here, Burkhart exercised his Fifth Amendment right not to testify and was declared to be unavailable. *Christian*, 967 P.2d at 244. His unavailability contrasts sharply with the availability of McDonald in *Chambers*, which the Supreme Court of the United States stressed greatly enhanced the reliability of the extrajudicial statements in that case. *Chambers*, 410 U.S. at 301. Burkhart could not "have been cross-examined by the State" nor could "his demeanor and responses [be] weighed by the jury" to gauge the truthfulness of the alleged confessions. *Id*.

**[9]** We further distinguish *Chambers* by noting that, in Christian's case, there is doubt not only about the truthfulness of the alleged confessions, but also about whether those confessions were ever made in the first place, in light of the unre-

---

[12]Mullins, one alleged recipient of a confession from Burkhart, had been convicted of several crimes of dishonesty. As noted previously, she had also acknowledged that she routinely used drugs with Burkhart and that she was uncertain as to whether he had been under the influence of drugs at the time of his confession to her. The other alleged recipient, Auld, was a convicted felon. The credibility of such confessions is not as great as the credibility of the confessions at issue in *Chambers*, where one confession was signed and made in the presence of reputable witnesses.

liability of the witnesses and the unrecorded form of the confessions. Given the fact that the Hawaii Supreme Court faced, in *Chambers*, an opinion that was explicitly tailored to "the facts and circumstances of [that] case," the Hawaii Supreme Court's distinguishing conclusion was reasonable. *Id.* at 303.

Contrary to Christian's assertions, our decision is in complete accord with *Chia v. Cambra*, 360 F.3d 997 (9th Cir. 2004), another case in which our circuit explored the parameters of *Chambers* in the context of habeas petitions. In *Chia*, we ordered the issuance of a writ of habeas corpus on behalf of the petitioner because, at trial, several exonerating confessions had been excluded from evidence. *Id.* at 1001. These statements clearly stated that the petitioner had not been involved in the murder at all. *Id.*

In *Chia*, the statements bore "strong indicia of reliability" and the exclusion of them by the state court was therefore unreasonable. *Id.* at 1004-05. The four statements bore high marks of both accuracy—one was made in a recorded police interview—and reliability—another statement was made "in real danger of imminent death—a traditional indicium of reliability." *Id.* at 1004-06. Moreover, the statements were entirely consistent with the independent observations of law officials and the Drug Enforcement Administration's version of the events. *Id.* at 1006. We concluded that, in light of such reliability, it was unreasonable to exclude the evidence.

**[10]** Again, such poignant reliability as that of the evidence in *Chia* is simply not present in the case before us. The alleged statements here were fewer in number, were strongly contradicted by the physical evidence, were made in far less reliable contexts and were perhaps never even made, given the unreliability of the witnesses. The Hawaii court's decision to exclude such materially less reliable evidence did not amount to an unreasonable application of clearly established federal law.

## IV

The Hawaii Supreme Court's application of *Chambers* was not unreasonable. We reverse the district court's decision to grant Christian's § 2254 habeas petition.

**REVERSED; PETITION DENIED.**