# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58847-1-II |
| Respondent/Cross-Appellant, | |
| v. | UNPUBLISHED OPINION |
| DONALD SALAVEA, | |
| Appellant/Cross-Respondent. | |

CHE, J. — Donald Salavea appeals his convictions for second degree manslaughter, first degree robbery with a firearm enhancement, and first degree unlawful possession of a firearm (UPOF).

Salavea and two others took a man's car at gunpoint after demanding the keys from the man's girlfriend. The girlfriend knew one of the men, Riley Kimbrough. Salavea drove the stolen car until he hit a motorcyclist and another vehicle and came to a stop. About an hour after police verified that Salavea was the driver and released him, a woman called the police to report that Kimbrough had been shot. Kimbrough was declared dead at the scene. The woman's description of the shooter matched Salavea. Police later arrested Salavea and during a search of his apartment found a shell casing, bullets, and a gun.

The State charged Salavea with second degree murder—both intentional and felony murder predicated on assault—with a firearm sentencing enhancement, first degree robbery with a

firearm sentencing enhancement, and UPOF. The State requested lesser included offense instructions of first and second degree manslaughter on the second degree intentional murder charge. The jury convicted Salavea of second degree manslaughter, UPOF, and first degree robbery and found by special verdict that he was armed with a firearm when he committed the robbery. The trial court imposed a standard range sentence after it determined that recent amendments to RCW 9.94A.525 precluded the inclusion of Salavea's juvenile disposition for first degree theft in his offender score.

Salavea argues his UPOF conviction violates his Second Amendment right to keep and bear arms, the trial court erred by granting the State's motion to instruct the jury on the lesser included offense of second degree manslaughter for second degree murder, and the trial court erred in several of its CrR 3.5 findings of fact and conclusions of law such that a new trial should be granted on the remaining charges. In his SAG, Salavea argues his firearm sentencing enhancement violates "double counting," and he is "actually and factually innocent" of first degree robbery with a firearm sentencing enhancement. SAG at 2, 9.

The State cross appeals, arguing the trial court must utilize the version of RCW 9.94A.525 that was in effect on the day of the offenses to calculate the offender score.

We hold that Salavea's challenge to Washington's UPOF statute fails, the trial court did not err by giving the second degree manslaughter instruction as a lesser included offense, the trial court did not err by admitting Salavea's statements made to the police, and Salavea's SAG claims fail.

We also hold that the trial court erred by applying Engrossed House Bill (EHB) 1324 retroactively to Salavea's offender score calculation. But because the law is also clear that

sentencing courts are to round down an offender score to the nearest whole number, which the trial court did here, there is no change to Salavea's offender score and thus, no remand for resentencing is required based on this error.

Accordingly, we affirm Salavea's second degree manslaughter, first degree robbery with a firearm sentencing enhancement, and UPOF convictions, as well as his sentence.

FACTS

BACKGROUND

In May 2022, Brooks Lopez witnessed three men take a sedan belonging to her then boyfriend, Jamie Gibbs. Lopez knew one of the three men, Kimbrough, but did not know the other two men. Witnesses described the second man, which differed from their description of the third man. The third man was described as taller, fair-skinned, and had star tattoos on his chest.

According to Lopez, Gibbs was in a "heated" conversation with the three men, who were standing outside of their home. 3 RP (June 28, 2023) (3 RP) at 318-19. Later, the fair-skinned man pointed a gun at her and demanded the keys to Gibbs' sedan. The gun was tan or beige and looked like a "slider gun."[1] 3 RP at 330. The fair-skinned man then drove away with the second man in the sedan, while Kimbrough left in a different vehicle.

Gibbs and Lopez reported the robbery to 911 while following behind the two vehicles. Once they saw the police pursuing the sedan, Gibbs and Lopez followed only the vehicle with Kimbrough. The sedan eventually hit a motorcyclist who was with his motorcyclist friends on the road. Two friends of the struck motorcyclist followed after the sedan when it did not stop. They

---

[1] A "slider gun" typically refers to a pistol, specifically the slide portion of the firearm, which is the upper portion that houses the firing pin and moves back and forth during firing.

then saw the sedan come to a stop after it clipped the front end of another car and slid out of control. The two motorcyclist friends did not lose sight of the sedan during their pursuit, confronted the driver as he exited the sedan, and convinced him to return with them to the scene of the motorcycle collision.

At the motorcycle accident scene, police detained the driver of the sedan. Police did not find firearms on the driver's person during a pat down or in the sedan. Police were unable to contact Gibbs and Lopez, and after identifying the driver as Salavea, police dropped off Salavea at a convenience store parking lot at 9:23 p.m. Salavea has star tattoos on his chest.

At 10:12 p.m., Catherine Alcorn called 911 to report that someone had shot her boyfriend, Kimbrough, in the head. During the call, Alcorn stated that the shooter was Samoan, looked about forty years old, was around six feet tall, was of medium build, had brown hair, did not have facial hair or glasses, was armed with a gun, and had left the residence approximately five minutes before she called 911.

Kimbrough was declared dead at the scene. When police moved Kimbrough's clothing, a spent round fell to the ground and when they moved his body, they found a 9 mm Luger shell casing. Police found no indication that more than one shot had been fired and found no firearm in the house or in the surrounding property.

The medical examiner determined Kimbrough died from a gunshot wound to the head. The bullet entered the top of the back of Kimbrough's head and exited under his chin. The medical examiner could not determine Kimbrough's body position at the time of the shooting or the distance from which Kimbrough was shot but speculated that the distance was greater than 12 to 18 inches.

4

Police later determined that Alcorn's description of the shooter's race and appearance was consistent with that of Salavea, whom they had identified in the earlier robbery incident.

Days later, police arrested Salavea when he exited an apartment. During their search of the apartment, police found a package addressed to Salavea using the apartment address. They also found a casing, bullets, and a firearm. The firearm had three functional safeties to prevent accidental discharge of the gun, was operable, had a 9 mm Luger caliber, and was a light brown, "brownish," tan color. 5 RP (July 12, 2023) at 757.

A forensic examiner determined that the 9 mm Luger casing recovered after moving Kimbrough's body was fired from the firearm found at Salavea's apartment, and the spent round recovered after moving Kimbrough's clothing was consistent with the class characteristics of the firearm.[2]

Detectives audio and video recorded Salavea's interrogation following his arrest. A detective read to Salavea the *Miranda*[3] warnings and then asked him if he understood his rights:

> Q: Do you understand these rights? Do you understand your rights?
> A: I hear what you're saying.
> Q: Huh?
> A: I hear what you're saying.
> Q: Do you understand them?
> A: Well, I'll abide by those rights.
> Q: What's that?
> A: I'll abide by those rights.
> Q: I just want – I just need to know if you understood those rights.
> A: I understand what you're saying.

---

[2] Class characteristics are measurable features of an object that can be used to identify a group to which it belongs.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Ex. 2 at 606-07.  When asked whether he wanted to answer the detectives' questions, Salavea did not affirmatively respond.[4]

The detective then gave Salavea an advisement of rights form and stated, "We just need you to sign right here. That shows you . . . [understand] your rights. It's not an admission of guilt to just understand . . . the rights I just read to you. You're welcome to read 'em yourself if you like." Ex. 2 at 608.  Salavea responded, "No. And I said I understand what you said." Ex. 2 at 608.  The second detective stated, "That[] [form is] just saying that we read [your rights] to you. That's all that that's saying." Ex. 2 at 608.  Salavea wrote, "I don't consent to any and all due process," and signed the advice-of-rights form with "Donald." 1 RP (June 13, 2023) at 51.

During the interrogation, Salavea stated that he did not clearly remember the events of the evening in question, particularly after police had dropped him off at the convenience store parking lot, because he had had "too much to drink." Ex. 2 at 672.  He stated that he did not remember anything after some point in the evening and woke up the next day with a bad headache.  As for his relationship with Kimbrough, Salavea stated that he had known Kimbrough for a while, that he visited Kimbrough about once a month, that he would pay Kimbrough to help him work on painting, construction, and pressure washing jobs, that they never fought over money for those jobs and that Salavea would pay him more than he paid himself, that they had not argued over anything, and that they did not have any conflicts with each other.  Salavea described Kimbrough as "my guy" and "my brother." Ex. 2 at 676, 696.  Toward the end of the interrogation, Salavea

---

[4] The interrogation transcript states Salavea responded, "Yeah," when the detective asked whether Salavea wanted to answer their questions.  Ex. 2 at 607.  However, later, the trial court determined Salavea did not say this.

raised his hand, palm facing outward, and said, "Can we stop this, please." Ex. 2 at 744. The detectives took a break and then ended the interrogation.

The State charged Salavea with second degree murder—both intentional and felony murder predicated on assault—with a firearm sentencing enhancement, first degree robbery with a firearm sentencing enhancement, and UPOF.

CrR 3.5 HEARING

Salavea moved to suppress statements he made to law enforcement. The interrogating officers denied making threats or promises to Salavea in order to have him answer their questions.

After a CrR 3.5 hearing, the trial court ruled that Salavea had voluntarily waived his constitutional right not to incriminate himself and that Salavea's statements made at the interrogation until he said, "Can we stop [this], please?" were admissible. Clerk's Papers (CP) at 469.

The trial court found, among other things, that Salavea voluntarily answered the detectives' questions, that Salavea was willing to answer questions, and that the testimonies of the two interrogating detectives were credible.

The trial court concluded, among other things, that viewing the totality of the circumstances, Salavea's waiver of his rights was knowing, intelligent, and voluntary; that assuming Salavea was under the influence, it did not impact his knowing, intelligent, and voluntary waiver of his rights; that Salavea writing "I don't consent to any and all due process" was not an invocation of his right to silence ; and that for purposes of *Miranda*, Salavea's statements to the detectives were admissible up until the point where Salavea said, "Can we stop [this], please?" and "put up his hand in a universal gesture for 'stop.'" CP at 469.

TRIAL

The case proceeded to a jury trial. For the purposes of Salavea's UPOF charge, the parties stipulated that Salavea had been previously adjudicated guilty of a serious offense. At the conclusion of its case, the State requested that for the second degree murder charges, the jury be instructed on the lesser included offenses of first and second degree manslaughter. Salavea objected, arguing that the factual prong of *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978) was not satisfied, which the trial court overruled. The trial court determined,

> I mean, here there's not a lot of evidence that's been presented about what happened inside [Kimbrough's] house, or really any. To the extent that there is evidence from Mr. Salavea that he was drinking that night, there was also evidence presented that Mr. Salavea and Mr. Kimbrough participated together acting in concert with what happened at Jamie Gibbs' and Brooks Lopez's house, I think the State's argument that whatever happened in that house, that could have been the product of negligence or recklessness, is enough to get to Manslaughter 1 and 2. So I am going to give Manslaughter 1 and 2.

9 RP (July 19, 2023) at 1149-50.

The jury acquitted Salavea of second degree murder and first degree manslaughter but convicted him of second degree manslaughter. The jury also convicted Salavea of UPOF and first degree robbery and returned a special verdict that he was armed with a firearm when he committed the robbery.

The State ultimately calculated Salavea's offender score as 9+ points on the manslaughter and robbery convictions and 6.5 points on the UPOF conviction, which rounded down to 6 points.

Salavea did not stipulate to his offender score and did not file a sentencing brief after the State

conceded its initial calculation was erroneous.[5]

The trial court determined that Salavea's juvenile first degree theft adjudication did not

count under recent amendments to RCW 9.94A.525. The court scored Salavea at 9+ points for

both the manslaughter and robbery convictions and 6 points for the UPOF conviction. In

sentencing Salavea, the court did not consider his juvenile first degree theft adjudication or any

crimes that had washed out, but instead focused on the facts of the current convictions.

Salavea appeals and the State cross appeals.

ANALYSIS

Salavea argues his UPOF conviction violates his Second Amendment right to keep and

bear arms, the trial court erred by granting the State's motion to instruct the jury on the lesser

included offense of second degree manslaughter for intentional second degree murder (count 1),

and a new trial should be granted on any remaining counts because the trial court erred in its CrR

3.5 findings of fact and conclusions of law, which admitted custodial statements Salavea made to

police without a valid *Miranda* waiver. In his SAG, Salavea argues his firearm sentencing

enhancement violates "double counting," and he is "actually and factually innocent" of first

degree robbery with a firearm sentencing enhancement. The State cross appeals, arguing the trial

---

[5] The State initially classified Salavea's three adult failure to register as a sex offender convictions as: 2003—class C, non-sex offense (wash); 2004—class C, sex offense (does not wash); and 2009—class B, sex offense (does not wash). Salavea notified the State of its potential miscalculation regarding its classification of the 2004 and 2009 failure to register convictions. The State filed a supplemental sentencing memorandum conceding that all of the failure to register convictions were class C non-sex offenses that washed out and should not be counted in Salavea's offender score calculation.

court must utilize the version of RCW 9.94A.525 that was in effect on the day of the offenses to calculate the offender score.

## I. SECOND AMENDMENT

Salavea challenges, based on *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022), his UPOF conviction as violative of the Second Amendment because the State failed to prove that Washington's UPOF statute is consistent with the nation's historical tradition of firearm regulation. We disagree and follow our reasoning in *State v. Ross*, 28 Wn. App. 2d 644, 537 P.3d 1114 (2023), *review denied*, 2 Wn.3d 1026 (2024), and *State v. Bonaparte*, 32 Wn. App. 2d 266, 554 P.3d 1245 (2024), *review denied*, 4 Wn.3d 1019 (2025).[6]

A.      *Legal Principles*

We review de novo the constitutionality of a statute. *State v. Batson*, 196 Wn.2d 670, 674, 478 P.3d 75 (2020). We presume that statutes are constitutional, and the challenger bears the burden of proving otherwise. *Id*.

The Second Amendment to the United States Constitution states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Second Amendment protects the right of "ordinary, law-abiding citizen[s]." *N.Y. State Rifle*, 597 U.S. at 9. But the right to bear arms has limits, which

---

[6] The State responds that Salavea's claim is unpreserved under RAP 2.5(a). We disagree. An appellant's claim that an UPOF conviction affects their Second Amendment right to bear arms is generally a manifest error affecting a constitutional right. *See State v. Koch*, 34 Wn. App. 2d 232, 236, 567 P.3d 653 (2025) (concluding that the defendant did not waive his claim that his second degree UPOF conviction violates the Second Amendment or article I, section 24).

include "longstanding prohibitions on the possession of firearms by felons." *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).

B.      *Salavea's Second Amendment Claim Fails*

In *Ross*, Division One examined recent United States Supreme Court jurisprudence on the constitutionality of certain firearm possession restrictions. 28 Wn. App. 2d at 647-50. The court noted that the Supreme Court in *Heller* explicitly recognized and affirmed restrictions on felon-firearm possession by stating "'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" *Ross*, 28 Wn. App. 2d at 647 (quoting *Heller*, 554 U.S. at 626-27).

After *Heller*, in *McDonald v. City of Chicago*, the Supreme Court acknowledged, "'[w]e made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons,'" and "repeat[ed] those assurances." 561 U.S. 742, 785, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) (plurality opinion) (citation omitted) (quoting *Heller*, 554 U.S. at 626-27).

Later, in *New York State Rifle*, the Court considered a licensing scheme regarding the right to carry handguns in public for self-defense. 597 U.S. at 11. In addressing *New York State Rifle*, Division One concluded that the Supreme Court continued to affirm the longstanding restrictions on possession of firearms by felons, stating:

> Relevant here, *N.Y. State Rifle* did not overrule, or cast doubt on, the Court's recognition in *Heller* and *McDonald* that the Second Amendment did not preclude prohibitions on felons possessing firearms. The six-justice majority opinion fully embraced the earlier decisions in *Heller* and *McDonald* that the Second and Fourteenth Amendments protect the right of "ordinary, law-abiding citizens to possess a handgun in the home for self-defense." Indeed, at least 11 times the majority referenced the Second Amendment right of "law-abiding" citizens.

*Ross*, 28 Wn. App. 2d at 649 (citation omitted). Thus, Division One held "consistent with *Heller*, *McDonald*, and *New York State Rifle*, the Second Amendment does not bar the State from prohibiting the possession of firearms by felons." *Id.* at 651.

Salavea acknowledges *Ross* but nonetheless asks this court to reject it because of its reliance on *Heller's* dicta. But "[e]ven if the quoted language [in a Supreme Court decision] is dictum, that does not mean that we are bound to disregard it" as Salavea requests. *Lee v. Sauvage*, 38 Wn. App. 699, 704, 689 P.2d 404 (1984).

For the first time in reply, Salavea argues that even if the language in *Heller*, that the Second Amendment protects the right of law-abiding citizens, is a holding, Salavea was not a "felon" exempt from Second Amendment protections because his predicate crime was a juvenile adjudication. But Salavea's classification as a felon is not determinative here. The Second Amendment protects the right of "ordinary, law-abiding citizen[s]." *N.Y. State Rifle*, 597 U.S. at 9; *Ross*, 28 Wn. App. 2d at 649. Salavea is not a law-abiding citizen such that he may enjoy Second Amendment protections.

Recently, we examined the constitutionality of firearm restrictions on non-law-abiding citizens in *Bonaparte*, where the defendant argued that the State must prove a "historical tradition of depriving a person of the right to possess a firearm based on a prior conviction for assault in the first degree" for such restrictions to be constitutional under the Second Amendment. 32 Wn. App. 2d at 271 (internal quotation marks omitted).

We examined *Heller*, *McDonald*, and *New York State Rifle*, before considering *United States v. Rahimi*, 602 U.S. 680, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024), a Second Amendment decision by the United States Supreme Court. *Bonaparte*, 32 Wn. App. 2d at 271-74. In *Rahimi*,

the Supreme Court analyzed a federal statute that prohibited the restrained party under a domestic violence restraining order from possessing a firearm. 144 S. Ct. at 1894. Despite the difference in context, a restraining order versus a felony conviction, *Rahimi* affirmed that restrictions on the possession of firearms by felons are presumptively lawful. *Id.* at 1902.

Indeed, *Bonaparte* highlighted the Supreme Court's "repeated articulation that prohibitions on the possession of firearms by felons are presumptively lawful or more general language that the Second Amendment right to keep and bear arms is 'not unlimited.'" 32 Wn. App. 2d at 278 (quoting *Heller*, 554 U.S. at 595). Among other things, we held that "the framework articulated in *New York State Rifle* of the government's need to demonstrate that a firearm restriction is 'consistent with this Nation's historical tradition' applies to restrictions on a *law-abiding citizen's right to bear arms*" and was not applicable to Bonaparte's case because he had previously been convicted of a felony. *Bonaparte*, 32 Wn. App. 2d at 276 (emphasis added). Likewise, here, Salavea is not a law-abiding citizen, so the "historical tradition" framework articulated in *New York State Rifle* does not apply to his challenge. Therefore, we hold that Salavea's challenge to Washington's UPOF statute fails. [7]

## II. LESSER INCLUDED OFFENSE JURY INSTRUCTION

Salavea argues the trial court erred by instructing the jury on the lesser included offense of second degree manslaughter for the second degree intentional murder charge in count 1 because the State did not present evidence that Salavea committed only the lesser crime. Specifically,

---

[7] Salavea further argues that because his UPOF conviction violates the Constitution, at any resentencing, his two prior UPOF convictions may not be included in his offender score. But because we do not find his current UPOF conviction violates the Second Amendment, we do not reach this argument.

Salavea challenges only the factual prong of the *Workman* test by contending that, where the only dispute was the identity of the shooter and the evidence showed that the killing could only have been intentional, not negligent, the State failed to show that Salavea committed only the lesser crime. We disagree that the trial court erred by giving the second degree manslaughter instruction.

A.       *Legal Principles*

Under RCW 10.61.006, a defendant may be convicted of a lesser included offense of the crime charged without being separately charged. To determine whether a party is entitled to a lesser included offense instruction, we employ a two-prong test. *State v. Condon*, 182 Wn.2d 307, 316, 343 P.3d 357 (2015); *see Workman*, 90 Wn.2d at 447-48 (setting forth this test).

For lesser included instructions, the party must show "'first, each of the elements of the lesser offense must be a necessary element of the offense charged [(legal prong)] [and,] second, the evidence in the case must support an inference that the lesser crime was committed [(factual prong)].'" *State v. Fernandez-Medina*, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (some alterations in original) (quoting *Workman*, 90 Wn.2d at 453).

> [W]hen there is affirmative evidence from which the jury could conclude that only the lesser included offense occurred, a lesser offense instruction should be given. The word 'only' is meant to suggest that a jury might have a reasonable doubt about whether the charged crime was committed but may find that, instead, the lesser crime was committed. Thus, the trial court should consider whether any affirmative evidence exists on which a jury could conclude that the lesser included offense was committed.

*State v. Coryell*, 197 Wn.2d 397, 414-15, 483 P.3d 98 (2021). Both the legal and factual prongs must be satisfied before a requesting party is entitled to the lesser included offense instruction. *Condon*, 182 Wn.2d at 316. Where there is relevant "conflicting evidence, this evidence presents

a question of fact for the jury," who is the sole judge of the weight and credibility of such evidence. *Coryell*, 197 Wn.2d at 414.

The purpose of the factual prong is to ensure that there is evidence to support the issuance of the requested instruction. *Fernandez-Medina*, 141 Wn.2d at 455. Where the parties challenge only the factual prong of the *Workman* test, we review the trial court's decision to give a lesser included offense jury instruction for an abuse of discretion. *State v. Sanchez*, 29 Wn. App. 2d 382, 395, 546 P.3d 436, *review denied*, 3 Wn.3d 1007 (2024); *see Coryell*, 197 Wn.2d at 405. An abuse of discretion occurs if the trial court "'relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.'" *Sanchez*, 29 Wn. App. 2d at 395 (quoting *Gildon v. Simon Prop. Grp, Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006)).

B.      *Affirmative Evidence Supports the Factual Prong for Giving the Lesser Included Offense Instruction on Second Degree Manslaughter*[8]

To convict Salavea of second degree intentional murder, the State had to prove that Salavea caused Kimbrough's death with intent to cause his death but without premeditation. RCW 9A.32.050(l)(a). To convict Salavea of second degree manslaughter, the State had to prove that Salavea acted with criminal negligence in causing Kimbrough's death.[9] RCW 9A.32.070. In other words, under the factual prong, to be entitled to a lesser included offense instruction on

---

[8] The parties do not dispute that the legal prong of the *Workman* test is met.

[9] A person is criminally negligent when they fail to be aware of a substantial risk that a wrongful act may occur and their failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation. RCW 9A.08.010(1)(d).

second degree manslaughter, the State must point to evidence that Kimbrough was killed with criminal negligence; that is, under circumstances where the shooter "fail[ed] to be aware of a substantial risk that a wrongful act may occur" and the failure to be aware of such risk constituted a gross deviation from a reasonable person's standard of care in the same situation. *Sanchez*, 29 Wn. App. 2d at 396; RCW 9A.08.010(1)(d).

The State presented the following affirmative evidence that could support criminal negligence. During the interrogation, Salavea stated that he did not clearly remember the events of the evening in question because he had had "too much to drink." Ex. 2 at 672. He also stated that he did not remember anything after some point in the evening and woke up the next day with a bad headache. From this evidence, the jury could find that Salavea's alcohol consumption impaired his ability to think clearly and clouded his judgment such that his discharge of the firearm was criminally negligent rather than intentional.

Additionally, Salavea stated that he had known Kimbrough for a while; that he visited Kimbrough about once a month; that he would pay Kimbrough to help him work on painting, construction, and pressure washing jobs; that they never fought over money for said jobs and that Salavea would pay him more than he paid himself; that they had not argued over anything; and that they did not have any conflicts with each other. Salavea described Kimbrough as "my guy" and "my brother." Ex. 2 at 676, 696. From this evidence, the jury could conclude that Salavea and Kimbrough had a close relationship and were not experiencing any active disagreements or disputes with each other. Thus, the jury could find that Salavea did not have a motive for intentionally shooting Kimbrough.

Salavea contends that evidence that the bullet entered the top of the back of Kimbrough's head and exited his chin, and that the firearm had three safeties designed to prevent accidental discharge of the gun "showed a killing that could only have been intentional, not negligent." Br. of Appellant at 24. However, the correct inquiry is not whether there is evidence establishing that Salavea committed only second degree intentional murder—to the exclusion of second degree manslaughter—but whether there is some affirmative evidence from which a jury might have a reasonable doubt about whether he committed second degree murder and may find that, instead, he committed second degree manslaughter. *See Coryell*, 197 Wn.2d at 414.

According to the medical examiner, Kimbrough died from a gunshot wound to the head. But the medical examiner could not determine Kimbrough's body position at the time of the shooting nor the distance from which Kimbrough was shot. At best, the examiner speculated that the distance between the gun and Kimbrough's head was greater than 12 to 18 inches. From this evidence, the jury might have had a reasonable doubt as to whether Salavea intentionally aimed and shot at Kimbrough.

As for the three functional safeties, though they were designed to prevent accidental discharge of the gun, gun safeties alone do not necessarily prevent unintentional shootings. From the evidence, the jury could find that Salavea discharged the gun with criminal negligence rather than intentionally.

Because the State presented affirmative evidence of a criminally negligent killing, as shown above, we hold that the lesser included offense instruction on second degree manslaughter met the factual prong of the *Workman* test. Thus, we hold that the trial court did not err by giving the second degree manslaughter instruction.

III. WAIVER AND INVOCATION OF RIGHT TO REMAIN SILENT

Salavea assigns error to several findings of fact and conclusions of law in his challenge alleging the trial court violated his Fifth Amendment right against self-incrimination by admitting statements from his custodial interrogation without a valid *Miranda* waiver. Specifically, Salavea contends he did not knowingly and voluntarily waive the right to remain silent; instead he invoked his *Miranda* rights. The State responds that Salavea did not unequivocally invoke his right to remain silent until the end of the interrogation. We conclude that the trial court did not err as Salavea was informed of his *Miranda* rights, waived his rights, and then unequivocally invoked his rights only toward the end of the interrogation.

A.      *Legal Principles*

The Fifth Amendment to the United States Constitution states, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Washington Constitution states, "[n]o person shall be compelled in any criminal case to give evidence against himself." Both provisions guarantee a defendant's "right to be free from self-incrimination, including the right to silence." *State v. Pinson*, 183 Wn. App. 411, 417, 333 P.3d 528 (2014) (alterations in original).

A person has the right to remain silent both before and after law enforcement gives *Miranda* warnings. *State v. Burke*, 163 Wn.2d 204, 217, 181 P.3d 1 (2008). After law enforcement gives *Miranda* warnings, "the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda*, 384 U.S. at 479.

But before the State introduces incriminating statements made during a custodial interrogation, it bears the burden of showing that the person knowingly and intelligently waived

their *Miranda* rights. *Id.* at 475. The State can demonstrate a valid waiver absent oral or written, formal or express statements of waiver. *Berghuis v. Thompkins*, 560 U.S. 370, 383, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). A court may properly conclude that the person waived their *Miranda* rights only when the totality of the circumstances shows "'an uncoerced choice and the requisite level of comprehension [regarding their rights].'" *State v. Mayer*, 184 Wn.2d 548, 556, 362 P.3d 745 (2015) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)).

After receiving *Miranda* warnings, a person may invoke the right to silence in response to any of law enforcement's questions. *State v. Chuprinov*, 32 Wn. App. 2d 508, 518, 556 P.3d 1127 (2024), *review denied*, 4 Wn.3d 1012 (2025). Once the person asserts their right to remain silent, the interrogation must stop. *Miranda*, 384 U.S. at 473-74.

Whether a person has unequivocally invoked the right to remain silent depends on "whether 'a reasonable police officer in the circumstances would understand the statement' to be an invocation of *Miranda* rights." *State v. I.B.*, 187 Wn. App. 315, 321, 348 P.3d 1250 (2015) (internal quotation marks omitted) (quoting *State v. Piatnitsky*, 180 Wn.2d 407, 413, 325 P.3d 167 (2014)). To be unequivocal, an invocation of *Miranda* rights requires "the expression of an objective intent to cease communication with interrogating officers." *Piatnitsky*, 180 Wn.2d at 412. This analysis is context specific and considers the circumstances leading up to the alleged invocation. *I.B.*, 187 Wn. App. at 321.

We review the trial court's findings of fact from a CrR 3.5 hearing to determine whether substantial evidence supports each challenged finding. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). We review conclusions of law de novo to determine whether they are

supported by the findings of fact. *State v. Pierce*, 169 Wn. App. 533, 544, 280 P.3d 1158 (2012).

We treat conclusions of law, that the trial court incorrectly denominates as findings of fact, as

conclusions of law and review them de novo. *State v. Luther*, 157 Wn.2d 63, 78, 134 P.3d 205

(2006). Unchallenged findings of fact are considered verities on appeal. *Pierce*, 169 Wn. App. at

544. And credibility determinations are left to the trier of fact and are not subject to review. *State*

*v. A.X.K.*, 12 Wn. App. 2d 287, 298, 457 P.3d 1222 (2020).

B.    *Salavea's Challenges Fail*

Salavea assigns error to four of the trial court's findings of fact (FF). Salavea assigns

error to FF 158 and 159, which state that the interrogating detectives were credible. But we do

not review credibility determinations. *Id*.

Salavea also assigns error to FF 88, that he "voluntarily answered questions," but only in

so far as it should be considered a legal conclusion. Br. of Appellant at 3. In addition, Salavea

assigns error to FF 108, that he "was willing to answer questions." Br. of Appellant at 3.

Substantial evidence supports FF 88 and 108.

First, we consider whether the State met its burden of showing that Salavea knowingly and

intelligently waived his *Miranda* rights. The parties do not dispute that the detectives gave

Salavea *Miranda* warnings from a preprinted form. And in response to several questions about

whether he understood his rights, Salavea said, "I hear what you're saying," "I'll abide by those

rights," and "I understand what you're saying." Ex. 2 at 606-07.

A detective gave Salavea the advice of rights form and stated, "We just need you to sign

right here. This shows you . . . understand your rights. It's not an admission of guilt to just

understand . . . the rights I just read to you. You're welcome to read 'em yourself if you like."

Ex. 2 at 608. Salavea responded, "No. And I said *I understand what you said.*" Ex. 2 at 608

(emphasis added). Salavea wrote, "I don't consent to any and all due process," and signed the

advice of rights form. 1 RP (June 13, 2023) at 51.

When a person makes an ambiguous or equivocal statement about the right to remain

silent or makes no statement, law enforcement is "not required to end the interrogation . . . or ask

questions to clarify whether the [person] wants to invoke [their] *Miranda* rights." *Berghuis*, 560

U.S. at 381. Salavea's statements in response to whether he understood his rights and his

handwritten statement in the advice of rights form were ambiguous or equivocal, so the

interrogating detectives were not required to end the interrogation.[10]

---

[10] Salavea contends the detectives "cajoled" him into speaking with them by "downplaying and mischaracterizing the meaning of the waiver form, and by ignoring his statements indicating he wanted to exercise his rights." Br. of Appellant at 46. Primarily, Salavea points to the statement: "That[] [form is] just saying that we read [your rights] to you. That's all that that's saying." Ex. 2 at 608. He cites *Miranda*, which states, "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 U.S. at 477. Salavea also cites *Mayer*, which states that courts have held confessions inadmissible where the police "'downplay [] the relevance of the warnings[] and their application to the current questioning.'" 184 Wn.2d at 562 (quoting *Doody v. Schriro*, 548 F.3d 847, 862-63 (9th Cir. 2008).

However, Salavea does not show that the officers downplayed the warnings such that they induced a waiver of rights. The officers asked Salavea whether he understood his rights and wanted to answer their questions and, at the CrR 3.5 hearing, they denied making threats or promises to Salavea in order to have him answer their questions. And unlike in *Mayer*, neither officer "emphasized that [Salavea] was not under arrest, thus downplaying the significance of the warnings and the adversarial nature of the encounter." 184 Wn.2d at 565. Moreover, the State does not use the signed form for the proposition that Salavea waived his rights and agreed to speak with police. Furthermore, the record does not show that the detectives disregarded Salavea's statements. As discussed above, Salavea waived his *Miranda* rights, and a reasonable police officer in the circumstances would not have understood Salavea's statements to be an invocation of the right to remain silent.

After affirmatively stating that he understood his rights, Salavea began answering the detectives' questions voluntarily and without coercion. It was only later that Salavea asked the detectives to stop questioning him and raised his hand, palm facing outward.

Under the totality of circumstances, the State met its burden to show that Salavea knowingly and intelligently, waived his *Miranda* rights. *See Berghuis*, 560 U.S. at 384 (stating that "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent"); *see also State v. Athan*, 160 Wn.2d 354, 380, 158 P.3d 27 (2007) (where there is no evidence that the interrogating detectives coerced the accused into answering their questions and the accused later invokes his *Miranda* rights, this suggests that the accused was "aware that [they] had not previously invoked them," thus "support[ing] a finding that [they] knowingly, voluntarily, and intelligently waived [their] right to remain silent prior to that point"). We conclude that the totality of the circumstances shows Salavea made an uncoerced, voluntary choice to speak with law enforcement, and he had the requisite level of comprehension regarding his rights.

Next, we consider whether Salavea unequivocally invoked his right to remain silent at any time during the interrogation. In *Piatnitsky*, detectives conducted an audio recorded post-arrest interview with Piatnitsky who indicated that he was willing to give a recorded confession. 180 Wn.2d at 409. After a detective asked if he understood his right to remain silent, Piatnitsky stated, "I have a right to remain silent. . . . That's the, [t]hat's the only one I remember. . . . That's the one I, I should be doing right now." *Id.* at 414 (internal quotation marks omitted). Piatnitsky also stated, "I'm not ready to do this, man" and "I just write it down, man. . . . I don't want to talk

right now, man." *Id.* (internal quotation marks omitted). The detectives advised Piatnitsky of his *Miranda* rights a second time, and he signed a waiver form. *Piatnitsky*, 180 Wn.2d at 409. Our Supreme Court held that Piatnitsky "understood he had a right to silence that he was not exercising," that the detectives reasonably concluded that Piatnitsky's statements were a preference for a written statement over a recorded one, and that he did not unequivocally invoke his right to remain silent. *Piatnitsky*, 180 Wn.2d at 414.

Like in *Piatnitsky*, the record shows that Salavea understood he had a right to remain silent that he was not exercising. Based on the context of the interrogation, the detectives could reasonably conclude that Salavea did not unequivocally invoke his right to silence when he responded to their questions about whether he understood his *Miranda* rights and continued to answer their questions. Indeed, Salavea confirmed that he heard and understood his rights. Salavea did, however, unequivocally invoke his right to remain silent toward the end of the interrogation when he raised his hand, palm facing outward, and said, "Can we stop this, please." Ex. 2 at 744. The parties do not dispute this. The detectives reasonably understood Salavea's statement and hand gesture to be an expression of objective intent to cease communication with them, so they ended the interrogation.

We conclude that Salavea waived his *Miranda* rights, that he did not unequivocally invoke his right to remain silent when the detectives read *Miranda* warnings, that it was reasonable for the detectives to interpret Salavea's statements as an expression of him understanding he had a right to remain silent that he was not exercising, that Salavea voluntarily answered questions, and that Salavea unequivocally invoked his rights only toward the end of the video when he raised his hand in a stop gesture and asked to stop. Therefore, the trial court's CrR 3.5 findings of fact are

supported by substantial evidence, and its conclusions of law are properly derived from the findings of fact. Thus, we hold that the trial court did not err by admitting the video recording of Salavea's interrogation at trial.

C.      *Article I, Section 9 To the Washington Constitution Is No More Protective than the Fifth Amendment To the United States Constitution*

Alternatively, Salavea argues that the trial court violated his rights under article I, section 9 to the Washington Constitution and that we should hold our state constitution is more protective than the Fifth Amendment under a *Gunwall* analysis.[11] The State responds that we are bound by the Supreme Court's prior rulings that article I, section 9 and Fifth Amendment protections are the same and that the two are coextensive. We agree with the State.

A *Gunwall* analysis is not necessary here because the Washington Supreme Court has already held that the protection of article I, section 9 is coextensive with, and not broader than, the protection of the Fifth Amendment. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008) (stating that "[t]he protection provided by the state provision is coextensive with that provided by the Fifth Amendment"), *State v. Russell*, 125 Wn.2d 24, 57-62, 882 P.2d 747 (1994) (concluding that a *Gunwall* analysis does not support extending greater protection through article I, section 9 than provided by its federal counterpart), *State v. Earls*, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991) (stating that where the defendant argued article I, section 9 should be interpreted as more protective than its federal counterpart, "resort to the *Gunwall* analysis is unnecessary because [the

---

[11] *See State v. Gunwall*, 106 Wn.2d 54, 60, 720 P.2d 808 (1986) (recommending that courts analyze six, nonexclusive criteria to determine whether a particular provision of the Washington Constitution affords more protective rights to its citizens than the United States Constitution does).

Supreme Court] has already held that the protection of article 1, section 9 is co-extensive with, not broader than, the protection of the Fifth Amendment"). And we are bound by the Supreme Court's rulings. *State v. Mathers*, 193 Wn. App. 913, 923, 376 P.3d 1163 (2016) (stating that, "[a] Washington Supreme Court decision is binding on all lower courts in the state").

Therefore, consistent with our Supreme Court case law, the protection of article I, section 9 is coextensive with that of the Fifth Amendment. Thus, we hold that the trial court did not violate Salavea's rights under article I, section 9 of the State Constitution by admitting the statements from his custodial interrogation.

## IV. STATEMENT OF ADDITIONAL GROUNDS

Salavea presents two grounds for relief in his SAG. First, Salavea contends that it is unlawful "double counting" (not double jeopardy) to impose a firearm sentencing enhancement on his first degree robbery conviction.[12] SAG at 2. Second, he claims that he is "actually and factually innocent" of first degree robbery with a firearm sentencing enhancement. SAG at 9. We hold that Salavea's SAG claims fail.

### A. *Double Counting Claim*

"[I]mpermissible double counting . . . occurs where one part of the [federal] Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines." *United States v. Reese*,

---

[12] Salavea clarifies he is not bringing a double jeopardy claim, but a double counting claim. Double counting claims are often found in the context of federal double jeopardy jurisprudence. But while a double counting claim asserts that a single aspect of conduct was used both to determine the applicable offense guideline and to increase the base offense level mandated, a double jeopardy claim generally asserts that the defendant was prosecuted or punished more than once for the same offense. *United States v. Reese*, 2 F.3d 870, 895 (9th Cir. 1993).

2 F.3d 870, 895 (9th Cir. 1993). "If, on the other hand, it is possible to be sentenced under a particular [federal] offense guideline without having engaged in a certain sort of behavior, such behavior may be used to enhance the offense level." *Id*.

Here, assuming without deciding that double counting applies in the state context, Salavea was charged with first degree robbery by being armed with a deadly weapon or displaying what appeared to be a firearm or other deadly weapon while committing or fleeing from the robbery. RCW 9A.56.200(1)(a)(i), (ii). Additional bases for first degree robbery include inflicting bodily injury while committing or fleeing from a robbery, and committing a robbery within and against a financial institution. RCW 9A.56.200(1)(a)(iii), (1)(b). A sentencing enhancement for the specific offense characteristic of being armed with a firearm does not result in impermissible double counting because it is possible for a person to be sentenced under the first degree robbery statute without having been armed with a firearm. Therefore, the fact that the deadly weapon Salavea possessed happened to be a firearm would be grounds for a proper sentence enhancement and would not constitute a form of double jeopardy for double counting. Salavea's claim of double counting fails.

B.      *Freestanding and Gateway Actual Innocence Claims*

The actual innocence doctrine applies when a petitioner is factually innocent of the convicted crime. *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998). The Supreme Court has recognized that a petitioner may raise two kinds of actual innocence claims. *In re Pers. Restraint of Weber*, 175 Wn.2d 247, 256, 284 P.3d 734 (2012). First, freestanding actual innocence claims are "constitutional claims of actual innocence in which innocence itself provides a basis for relief." *Id*. Second, gateway actual innocence claims are

"used to avoid procedural time bars so that a court may review other claimed constitutional errors." *Id.*

Salavea asserts both types of actual innocence claims. Assuming without deciding that Salavea may raise a freestanding actual innocence claim, he must demonstrate more than what is required to establish a gateway actual innocence claim. *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) (stating that the standard for establishing a freestanding actual innocence claim is extremely high). To meet the standard for a gateway actual innocence claim, Salavea must, at a minimum, "'go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.'" *Id.* (quoting *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997)).

Salavea's actual innocence argument relies on his contention that a video presented at trial contradicted the unreliable and inconsistent testimony of Lopez, a robbery witness, because the video evidence showed he did not have a gun. It is unclear what video Salavea is referring to, but it appears that it is outside the record designated on appeal.[13] And we do not address claims on direct appeal that depend on evidence outside the record on appeal. *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

Regardless, Salavea acknowledges that we defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. Here, Lopez testified that a taller man with fair skin and star tattoos on his chest, who was with Kimbrough and a second man, pointed a gun at her and demanded the keys to Gibbs' sedan. She also testified that the gun

---

[13] The only video evidence that is part of the appellate record consists of two versions of the interrogation video, exhibits 1 and 252.

was tan or beige and looked like a "slider gun," which is consistent with the appearance and description of the firearm found in Salavea's apartment. 3 RP at 330.

After receiving the keys from Lopez, the fair-skinned man drove the sedan away from the house with the second man while Kimbrough left in a different vehicle. Gibbs and Lopez followed the sedan until they saw the police pursue the vehicle, and then other witnesses followed the sedan after it got into another accident. The other witnesses convinced the fair-skinned driver, identified by police as Salavea, to return to the initial accident scene. Salavea fails to demonstrate that he is probably innocent of the first degree robbery with a firearm enhancement conviction. Thus, his gateway actual innocence claim fails. And because Salavea cannot even meet the standard required for the less onerous gateway actual innocence claim, his freestanding actual innocence claim also fails.

To the extent that Salavea raises a sufficiency of the evidence claim, from the facts above, viewed in the light most favorable to the State, a rational trier of fact could conclude that Salavea committed a robbery while armed with a deadly weapon or displaying what appeared to be a firearm or other deadly weapon. *State v. Stewart*, 12 Wn. App. 2d 236, 239, 457 P.3d 1213 (2020) (stating that for sufficiency of the evidence claims, we view the evidence in the light most favorable to the State in determining whether any rational trier of finder could have found the elements of the crime beyond a reasonable doubt). In other words, a rational trier of fact could have found Salavea guilty beyond a reasonable doubt of each element of first degree burglary. This claim fails.

V. STATE'S CROSS APPEAL

The State argues that the trial court erred by applying amended RCW 9.94A.525 in calculating Salavea's offender score. Salavea replies that we should reject the State's cross appeal because it ultimately advocates for the same offender scores and standard ranges that the trial court already calculated.[14] We agree with the State.

In May 2022, when Salavea committed the crimes, former RCW 9.94A.525(1) (2021) generally required prior juvenile dispositions to be counted when calculating an offender score. But pursuant to EHB 1324, 68th Leg. (Wash. 2023), effective July 23, 2023, and before Salavea's sentencing, "[A]djudications of guilt pursuant to Title 13 RCW [Juvenile Courts and Juvenile Offenders] which are not murder in the first or second degree or class A felony sex offenses may not be included in the offender score." LAWS OF 2023, ch. 415, § 2 (codified at RCW 9.94A.525(1)(b)).

We recently held that EHB 1324 does not apply retroactively. *See State v. Gibson*, 33 Wn. App. 2d 618, 622-23, 563 P.3d 1079 (2025) (holding that because EHB 1324 was not in effect when Gibson committed the offense in March 2023, it did not apply to the calculation of his offender score); *see also State v. Troutman*, 30 Wn. App. 2d 592, 599-600, 546 P.3d 458 (2024), *review denied*, 554 P.3d 1217 (2024) (holding that "[b]ecause the plain language is unambiguous and does not evince a legislative intent for EHB 1324 to apply retroactively, we conclude that

---

[14] Including Salavea's juvenile disposition would have no practical implication for his sentence. *See* Reply Br. of Appellant at 44 (stating, "If the State is correct, a half point would be added, and then removed again in the rounding process. RCW 9.94A.525 (2017). The scores would be the same. The ranges would be the same"); *see also* 12 RP (October 13, 2023) at 1274-75 (the trial court noting that the inclusion of the juvenile disposition "doesn't practically impact the standard range that [Salavea's] facing").

under the SRA, RCW 9.94A.345, and the saving clause, RCW 10.01.040, the law in effect at the time of the offense applies to [the defendant's] sentence").

Here, the trial court applied EHB 1324 in calculating Salavea's offender score and therefore did not include his juvenile disposition for first degree theft. But EHB 1324 does not apply retroactively; therefore, the court should have applied the law in effect at the time of the commission of the offenses to Salavea's sentence and included the juvenile disposition in Salavea's offender score. *Troutman*, 30 Wn. App. 2d at 599-600. Thus, we hold that the trial court erred by applying EHB 1324 retroactively to Salavea's offender score calculation. But because the law is also clear that sentencing courts are to round down an offender score to the nearest whole number, which the trial court did here, there would be no change to Salavea's offender scores and thus, no remand for resentencing is required based on this error. RCW 9.94A.525.

## CONCLUSION

We hold that Salavea's challenge to Washington's UPOF statute fails, the trial court did not err by giving the lesser included second degree manslaughter instruction, the trial court did not err by admitting Salavea's statements made to the police, and Salavea's SAG claims fail. We also hold that the trial court erred by applying EHB 1324 retroactively to Salavea's offender score calculation. But because the law is clear that sentencing courts are to round down an offender score to the nearest whole number, which the trial court did here, there would be no change to Salavea's offender scores and thus, no remand for resentencing is required based on this error.

No. 58847-1-II

Accordingly, we affirm Salavea's second degree manslaughter, first degree robbery with a firearm enhancement, and UPOF convictions, as well as his sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Lee, P.J.

Price, J.